2025 IL App (1st) 251351B-U

FIFTH DIVISION
November 7, 2025

No. 1-25-1351B

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 24 CR 12514 |
| | ) | |
| GAD HUGHES, | ) | Honorable |
| | ) | Antara Nath Rivera and |
| Defendant-Appellant. | ) | Michael Clancy, |
| | ) | Judges Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's pretrial detention where the State showed by clear and convincing evidence that the proof is evident or the presumption great that defendant committed the charged offense.

¶ 2    Defendant Gad Hughes appeals from the circuit court's order detaining him before trial pursuant to section 110-6.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-6.1 (West 2022)), commonly known as the Pretrial Fairness Act. Mr. Hughes's sole argument on appeal is that the State failed to establish by clear and convincing evidence that the proof was

evident or the presumption great that he committed first degree murder, which is the detainable offense he was charged with. See *id.* § 110-6.1(a)(1.5). We reject this argument and affirm the circuit court order continuing his pretrial detention.

¶ 3                                    I. BACKGROUND

¶ 4     On December 1, 2024, the State petitioned to detain Mr. Hughes before trial pursuant to section 110-6.1 of the Code. *Id.* § 110-6.1. On the same day, a hearing on the petition was held before Judge Antara Nath Rivera. Mr. Hughes was present and represented by counsel. The State proffered at the hearing that Mr. Hughes's "guardian"—who the State later referred to as Mr. Hughes's father—and police officers who were familiar with Mr. Hughes, identified him on surveillance footage near the 62-year-old victim's residence around the time the victim was shot and killed inside the residence on November 28, 2024.

¶ 5     According to the State, around 2:40 p.m. that day, Mr. Hughes drove a Dodge Caravan owned by his guardian or father to a restaurant on the corner of Monroe and Pulaski. He parked the van and entered the restaurant. As he did so, he was recorded on surveillance footage wearing a black hoodie, gray pants, "Jordan 11 shoes," a blue surgical glove on his right hand, and "his dread hairstyle up in a ponytail." About 18 minutes later, he left the restaurant and drove the Dodge Caravan "towards the victim's residence nearby." Two minutes later, he returned to the restaurant and exited the Dodge Caravan wearing the same clothes. Two other individuals also exited the van. Four minutes after that, Mr. Hughes walked west on Monroe, crossed Pulaski, and stopped in front of the victim's residence.

¶ 6     The State maintained that "a distant surveillance video" showed Mr. Hughes raising his arm towards the victim's home as he fired multiple shots, which broke the windows, struck the victim inside, and killed him. The victim's daughters heard shots but did not see anything. Mr.

Hughes then continued walking west. The victim was discovered about 15 minutes after the shooting. Police recovered 11 .40-caliber spent shell casings near where Mr. Hughes was seen in the video footage that the State claimed was of the shooting, and all the casings were fired from the same gun.

¶ 7 The State continued that, the following day, November 29, 2024, police curbed Mr. Hughes while he drove the same Dodge Caravan and arrested him. Police recovered from the vehicle 90 bags of heroin, Mr. Hughes's work identification, "multiple blue gloves," and Mr. Hughes's phone. His phone contained web searches made early that morning for "man shot" and "man shot Chicago," a YouTube video titled "62-year-old man shot through window of West Side home," and a Fox News page discussing the shooting. It also contained outgoing text messages asking people for bullets and stating that Mr. Hughes believed he was in trouble. At a subsequent hearing, the State explained it did not know when Mr. Hughes sent the text messages, as discovery was ongoing.

¶ 8 The State noted that Mr. Hughes was on parole following a 2021 federal firearms conviction and had prior felony convictions for possession of a controlled substance and aggravated unlawful use of a weapon.

¶ 9 The State argued the proof was evident or the presumption great that Mr. Hughes committed first degree murder where multiple people identified him as the person seen on surveillance videos walking to and from the Dodge Caravan, one video showed that same person walking to the scene of the murder and firing a gun towards the victim's residence, and his cell phone contained searches and text messages related to the murder.

¶ 10 The court found that the State's proffer adequately established that the proof was evident or the presumption great that Mr. Hughes committed the detainable offense of murder. The court

stated that video footage showed Mr. Hughes "in front of the victim's residence raising his arm and firing multiple rounds from a firearm." The court also found that the State had shown by clear and convincing evidence that Mr. Hughes posed a real and present threat to the safety of a person or the community based on the proffered facts of the case, and no condition or combination of pretrial release conditions could mitigate that threat. The court therefore granted the State's petition to detain Mr. Hughes before trial.

¶ 11   On March 14, 2025, Mr. Hughes filed a motion to redetermine his pretrial detention. He argued that no one had identified him in the video of the alleged shooting. He also contended that the video, which was tendered to the defense after the original detention hearing, did not actually show a shooting. Mr. Hughes further argued that the State's case rested on his whereabouts around the time of the shooting but there was no evidence showing what time the shooting had occurred.

¶ 12   At a hearing before Judge Michael Clancy on May 7, 2025, the court and the State noted that a detention hearing began on April 15, 2025, at which the video of the alleged shooting was played, and was continued for the court to review additional evidence. There is no transcript from that April 15 hearing in the record on appeal.

¶ 13   During the May 7, 2025, hearing, the State, for the first time, published numerous videos that, according to the State, showed Mr. Hughes's movements around the time and location of the shooting on November 28, 2024. These videos are not in the record but are described by the State in the report of proceedings. According to those descriptions, a red Dodge Caravan entered the parking lot of a restaurant called "Baba's" on the 3900 block of West Monroe Street. A person wearing a blue jacket, gray jeans, and Jordan shoes, exited the driver's side of the van and entered Baba's. Mr. Hughes's father allegedly identified Mr. Hughes from a still image of surveillance footage taken inside Baba's as that person. That person then exited Baba's. The State noted it had

previously proffered that, at this point, Mr. Hughes drove the Dodge Caravan away from Baba's before returning, but "discovery [was] ongoing" and it did not have video of Mr. Hughes driving away from Baba's.

¶ 14    The next videos the State published showed, according to the State's descriptions, the Dodge Caravan returning to the Baba's parking lot about eight minutes after Mr. Hughes allegedly drove away. Two videos then showed a person, who the State contended was Mr. Hughes, exiting the driver's seat, walking south towards Monroe, and turning west. That person wore gray jeans, Jordan shoes, and one blue surgical glove, but no blue jacket.

¶ 15    The State also published a video of what it contends is the alleged shooting, which is the only video included in the record on appeal. That video, which is timestamped 3:02 p.m. on November 28, 2024, and is about one minute long, depicts a blurry image of a person who appears to be wearing a black top and gray pants crossing an intersection and pausing for 10 to 15 seconds across the street from the first house after the intersection. The blurry figure then continues to walk in the same direction it had previously. The camera appears to be positioned down the street that the person crosses, on the side of the intersection where the person began. The State also published what it said was a "zoomed in version" of that video, which is not included in the record on appeal.

¶ 16    The State contended at the May 7, 2025, hearing that the video showed Mr. Hughes walking west on Monroe, crossing Pulaski, stopping across the street from a house at 4005 West Monroe where defense counsel indicated the victim was found, and then continuing west on Monroe. The court asked where the spent shell casings were found; the State responded they were found on the sidewalk and lawn where Mr. Hughes was standing across the street from the house, and defense counsel indicated that an incident report stated they were found at 4006-12 West Monroe, which the court noted would be across the street from 4005 West Monroe.

¶ 17    The State described its next videos as showing Mr. Hughes, wearing a black hoodie and gray jeans, in the parking lot of an establishment called "Ocky Way" at 2 South Pulaski, which it stated was across the street from Baba's. The State proffered that the videos showed Mr. Hughes opening and closing the rear passenger door of a red Jeep in the Ocky Way parking lot, entering Ocky Way, exiting Ocky Way about one minute later, crossing Pulaski to the Baba's parking lot, entering the driver's seat of the Dodge Caravan, and driving away. The State published still images in which, according to the State, Mr. Hughes's father and police officers familiar with Mr. Hughes identified Mr. Hughes as the person entering Ocky Way wearing gray pants and a black hoodie. The State told the court that Mr. Hughes's father also identified a still of the red Dodge Caravan as his vehicle which Mr. Hughes sometimes drove, although he did not know Mr. Hughes had it the day of the shooting. The State also published "Google image[s]" showing the locations of Baba's and Ocky Way. As with the videos, none of these stills or images are included in the record on appeal.

¶ 18    Defense counsel argued that no one identified Mr. Hughes in the video of the alleged shooting, the video did not even show a shooting, and it was unclear what time the shooting had occurred. Further, some videos showed Mr. Hughes wearing a blue jacket rather than a black hoodie, and one video depicted another individual wearing a dark top and light pants enter the van Mr. Hughes was allegedly driving that day. Counsel argued that individual could have been the shooter as his clothes were similar to the alleged shooter's. Counsel claimed the State therefore failed to meet its burden of showing the proof was evident or the presumption great that Mr. Hughes committed the offense.

¶ 19    The State responded that the victim's daughters heard shots about 15 minutes before discovering their father, and police were called around 3:21 p.m. The State argued that the video

of the shooting shows the same individual wearing a black hoodie and gray pants who had exited the Dodge Caravan in the Baba's parking lot and walked west down Monroe standing where shell casings were recovered across the street from the home where the victim was found.

¶ 20    The court denied Mr. Hughes's motion. It cited *People v. Watkins-Romaine*, 2025 IL App (1st) 232479-B, in which pretrial detention was affirmed based on circumstantial evidence even though no one positively identified the defendant as the shooter. According to the court, the video evidence here "clearly establishe[d]" that Mr. Hughes was at or near the crime scene before and after the shooting, and "basically, circling around a total area of about one block." Videos showed him exiting his father's red van in the Baba's parking lot, which was "kitty-corner" from the victim's house, and turning west on Monroe. The video of the alleged shooting showed, shortly thereafter, someone wearing a black hoodie and gray pants pausing on Monroe and facing the victim's house where the shell casings were later found. Mr. Hughes was then identified at Ocky Way just after the shooting wearing a black hoodie and gray pants.

¶ 21    The court also cited the proffered contents of Mr. Hughes's phone, including the searches that appear to be about the shooting. The court concluded, "viewing all the evidence in its totality and the reasonable inferences that [could] be drawn from all the circumstantial evidence," the State had shown by clear and convincing evidence that the proof was evident or the presumption great that Mr. Hughes committed the offense. The court denied Mr. Hughes's motion to redetermine pretrial detention.

¶ 22    On May 19, 2025, Mr. Hughes filed a motion for relief from pretrial detention, repeating his previous arguments. Following a hearing before Judge Clancy on the same day, the court denied the motion, reiterating that the circumstantial evidence created the reasonable inference that Mr. Hughes was the shooter. This appeal followed.

¶ 23                              II. JURISDICTION

¶ 24    The court denied Mr. Hughes's motion for relief from pretrial detention on May 19, 2025, and he filed a notice of appeal on June 26, 2025. We have jurisdiction over this appeal under section 110-6.1(j) of the Code (725 ILCS 5/110-6.1(j) (West 2022)) and Illinois Supreme Court Rule 604(h) (eff. Apr. 15, 2024), which govern appeals from orders denying the pretrial release of a criminal defendant and allow the filing of a notice of appeal at any time before conviction, provided that the defendant has filed, as Mr. Hughes did, a motion for relief in the circuit court.

¶ 25                              III. ANALYSIS

¶ 26    Section 110-6.1(e) of the Code (725 ILCS 5/110-6.1(e) (West 2022)) provides that "[a]ll defendants shall be presumed eligible for pretrial release." The State must seek pretrial detention by filing a timely, verified petition. *Id.* § 110-6.1(a), (c). To obtain that relief, the State must show by clear and convincing evidence that (1) "the proof is evident or the presumption great" that the defendant committed a qualifying offense, (2) he "poses a real and present threat to the safety of any person or persons or the community," and (3) "no condition or combination of conditions" set forth in section 110-10(b) of the Code (725 ILCS 5/110-10(b) (West 2024)) can mitigate either that safety risk or the defendant's willful flight. 725 ILCS 5/110-6.1(e)(1)-(3) (West 2022).

¶ 27    Clear and convincing evidence is "that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question." (Internal quotation marks omitted.) *People v. White*, 2024 IL App (1st) 232245, ¶ 19. Despite the court's use in *White* of the term "reasonable doubt," our courts have consistently recognized that the clear-and-convincing-evidence standard is less than the beyond-a-reasonable-doubt standard necessary for a conviction. See, *e.g., People v. Morales*, 2024 IL App (2d) 230597, ¶ 15.

¶ 28    "The rules concerning the admissibility of evidence in criminal trials do not apply to the

presentation and consideration of information at [a pretrial detention] hearing." 725 ILCS 5/110-6.1(f)(5) (West 2022). Rather, either side "may present evidence *** by way of proffer based upon reliable information." *Id.* § 110-6.1(f)(2). The court's ultimate decisions "regarding release, conditions of release, and detention prior to trial must be individualized, and no single factor or standard may be used exclusively to order detention." *Id.* § 110-6.1(f)(7). As there were no live witnesses who testified during Mr. Hughes's detention hearings, our review of the proffered evidence is *de novo*. *People v. Morgan*, 2025 IL 130626, ¶¶ 21, 51.

¶ 29     On appeal, Mr. Hughes has filed a memorandum pursuant to Rule 604(h)(7) (eff. Apr. 15, 2024) advancing the claim that he made in his motion for relief that the State failed to meet its burden of showing by clear and convincing evidence that the proof is evident or the presumption great that he committed first degree murder.

¶ 30     Mr. Hughes argues that the State's evidence did not meet its burden because, at the initial detention hearing on December 1, 2024, the court did not view the video of the alleged shooting and the State's description of that video overstated its evidentiary value. He notes that he was identified in still images from other surveillance videos and not the video of the alleged shooter, and that another individual wearing a dark top and light pants is seen entering the Dodge Caravan.

¶ 31     Having reviewed the video of the alleged shooting ourselves, we agree with Mr. Hughes that, on its own, it is minimally probative and the State, in its initial proffer, overstated what the video showed. We commend the circuit court and counsel for Mr. Hughes for insisting on presentation of the videos and we caution the State to avoid overstating the proffered evidence.

¶ 32      Mr. Hughes is correct that the "shooting" video merely shows a blurry figure wearing gray pants and a black top walking and pausing across the street from a house. It cannot be clearly seen that the person raises his arm, let alone fires a gun. The State, in our view, overstated its evidence

9

when it told the court that it had a video that showed Mr. Hughes raising his arm towards the victim's home and firing multiple shots.

¶ 33    However, at the May 7, 2025 hearing, the State also presented other videos that show a person, wearing similar clothing to the shooter, exit a van owned by Mr. Hughes's father and walk west on Monroe towards the area where the shots were allegedly fired, and a person wearing similar clothing entering Ocky Way after the shooting who was, according to the State, identified by people who knew him as Mr. Hughes. Although none of those other videos are included in the record on appeal, neither defense counsel nor the circuit court took issue with the State's description of their content, and the burden would be on Mr. Hughes, as the appellant, to include those videos in the record if he wanted to dispute that description. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (noting it is appellant's burden to present a sufficiently complete record of the proceedings to support a claim of error, and any doubts arising from the incompleteness of the record are resolved against the appellant).

¶ 34    Moreover, the State's proffer also included the fact that Mr. Hughes was arrested the day after the shooting driving the same Dodge Caravan that was shown in surveillance parked in the Baba's restaurant parking lot. Police recovered from the van blue gloves, which Mr. Hughes was allegedly wearing when he exited the van before the shooting, as well as Mr. Hughes's identification and cell phone.

¶ 35    The cell phone provided additional circumstantial evidence of Mr. Hughes's guilt. Mr. Hughes's phone contained text messages in which Mr. Hughes asked for bullets and stated he was in trouble, although the State could not say, at the time of the detention hearings, when he sent the messages. It also contained searches from the early morning of November 29, 2024, the day after the shooting, that included a YouTube video referencing a 62-year-old man who was shot through

10

the window of his home, which coincides with the facts of the alleged offense, and a news article discussing that same shooting. The text messages and the searches, considered with the other evidence, support the State's argument that it has provided clear and convincing circumstantial evidence of Mr. Hughes's guilt.

¶ 36    In sum, the evidence before the court was that Mr. Hughes was near the shooting around the time of the shooting, wearing similar clothing to the alleged shooter, driving a van like the one from which the alleged shooter walked towards the location of the shooting, at some point requested bullets and stated he was in trouble, and searched for news about the shooting shortly after it took place. Even in assessing guilt at trial, circumstantial evidence may sustain a conviction. *People v. Galarza*, 2023 IL 127678, ¶ 27. This circumstantial evidence was sufficient to meet the State's burden here.

¶ 37    Mr. Hughes distinguishes the circumstantial evidence in this case from that in *Watkins-Romaine*, the case that the circuit court cited in denying his motion to redetermine his pretrial detention. In that case, the defendant had, "stat[ed] his intention to 'shoot up' a house on the same street as the victim's boyfriend's house—the house from which the victim departed immediately before she was followed and shot by someone driving a vehicle owned by defendant's girlfriend." *Watkins-Romaine*, 2025 IL App (1st) 232479-B, ¶ 30. The circumstantial evidence in this case is certainly different but it still suffices to meet the State's burden. Here, Mr. Hughes was shown to be present in the area of the shooting, wearing clothing that was similar to the clothing of the alleged shooter, and allegedly walking toward the shooting at the time it occurred. In addition, the contents of his cell phone suggested his involvement in the shooting.

¶ 38    Mr. Hughes also points out that another person observed in the videos wore similar clothing and could have been the shooter. This might form a defense at trial, but the possibility of

11

a defense does not compel a finding that the State failed to meet its burden at the pretrial detention stage. *People v. Reed*, 2023 IL App (1st) 231834, ¶ 25; see *Morales*, 2024 IL App (2d) 230597, ¶ 15 (stating that the clear-and-convincing standard is less than the beyond-a-reasonable-doubt standard).

¶ 39    In short, the circuit court here did not err in finding that the State established by clear and convincing evidence that the proof was evident or the presumption great that Mr. Hughes committed the qualifying offense of murder. Our own *de novo* review of the evidence confirms this finding.

¶ 40                                IV. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County requiring Mr. Hughes to be held in pretrial detention.

¶ 42    Affirmed.